539 P.2d 178

**John B. PERRY, Petitioner,**

**v.**

**The INDUSTRIAL COMMISSION of Arizona, Respondent,**

**Arthur G. McKee & Company, Respondent Employer,**

**General Accident Assurance Corporation, Respondent Carrier.**

**No. 1 CA–IC 1191.**

Court of Appeals of Arizona, Division 1, Department C.

Aug. 26, 1975.

Rehearing Denied Sept. 18, 1975.

Review Granted Oct. 28, 1975.

Davis, Eppstein & Tretschok by Robert W. Eppstein, Tucson, for petitioner.

Greg L. Folger, Chief Counsel, The Industrial Commission of Arizona, Phoenix, for respondent.

Everett, Bury & Moeller, P. C., by J. Michael Moeller, Tucson, for respondents carrier and employer.

## OPINION

STEVENS, Judge.

John B. Perry (petitioner) sustained an industrially related low back injury. There is no issue as to that fact. After a hearing, an award was entered holding that the petitioner's condition became medically stationary with an absence of any resulting physical or mental permanent disability. In a timely manner the case was presented to this Court.

This case is unusual in that the petitioner was the only person to testify at the formal hearing, all of the medical evidence being presented by depositions.

The petitioner was seen by R. P. Brower, M.D., of San Manuel, Arizona; Jacob B. Redekop, M.D., an orthopedic surgeon in Tucson, Arizona; by John F. Mc-Cluskey, Jr., M.D., an orthopedic surgeon of Houston, Texas; by Lynn L. Pearson, M.D., an orthopedic surgeon of Webster, Texas; and by A. E. Minyard, M.D., an orthopedic surgeon of Galveston, Texas. In addition, he was seen by medical doctors whose full names do not appear in the file and who did not testify: namely, Dr. Rosenblad; Dr. Freeman; Dr. Lockhart and possibly others. Dr. Rosenblad is a general practitioner and Drs. Freeman and Lockhart are orthopedic surgeons.

The petitioner was injured on 2 February 1973 at approximately 8:15 a. m. while working in San Manuel. The exact distance and nature of the fall causing his low back injury are not too clear in the record. Dr. Brower saw the petitioner at approximately 9:30 a. m. that day. The petitioner was hospitalized in Tucson that afternoon under the care of Dr. Redekop. He was not released from the hospital until 12 February. In the meantime, Dr. Redekop secured a myelogram which was negative. During the course of the petitioner's testimony his counsel made reference to Dr. Redekop's report of 12 February "which is in evidence" but the report was not forwarded to this Court as a part of the file. The petitioner testified, without contradiction, that when he was released from the hospital in Tucson, Dr. Redekop placed no restrictions on his work activity. Dr. Redekop apparently advised the petitioner that he saw no reason why the petitioner should not return to his

home in Texas seeking medical aid there if needed. The petitioner's testimony was, basically, a historical recitation of post injury events. It appears entirely credible and we find no adverse comments relative thereto in the hearing officer's decision and award.

 Before going forward with this opinion we desire to state that we recognize the well established rule that on the judicial review of an Industrial Commission award, the Court will sustain the award if there is credible evidence to support it. This rule arises where the hearing officer hears live testimony and observes the witnesses. Here the key evidence is the medical evidence, all of which was presented by deposition. With due respect to the duties and responsibilities of the hearing officer, this Court has the same ability to review and evaluate the deposition evidence as does the hearing officer and if this Court concludes that the weight thereof is contrary to the conclusions of the hearing officer, this Court will not hesitate to disagree. In *Broadus v. The Industrial Commission of Arizona*, 18 Ariz. App. 429, 503 P.2d 387 (1972) (review denied) we stated:

"The medical evidence is documentary only. We can weigh this evidence as well as could the hearing officer. We are not here faced with the hearing officer's evaluation of live but conflicting medical evidence." 18 Ariz.App. at 435, 503 P.2d 393.

After the petitioner's release from his 10-day hospital stay in Tucson, he returned to his home in Texas and came under the care of Dr. Rosenblad. Although Dr. McCluskey does not recall just how the petitioner came to him, it appears that the petitioner was referred to him by Dr. Rosenblad.

Dr. McCluskey first saw the petitioner on 12 March 1973. He had the benefit of the report of the Tucson myelogram. On 15 March an electromyogram was performed which was normal. Dr. McCluskey hospitalized the petitioner in the Clear Lake Hospital from 20 March to 26 March 1973 for conservative treatment and observation as an in-patient. Just prior to this hospitalization the petitioner sustained the "gear shifting incident." He could not shift his car and to free the gear shifting mechanism he was required to open the car hood and to lean in. In so doing he experienced low back discomfort. The petitioner testified that no greater discomfort was experienced from this incident than from numerous other post injury body movements. Prior to the petitioner's release from Dr. McCluskey's hospitalization he was seen by Dr. Pearson at the request of Dr. McCluskey's partner, Dr. Freeman. He was released from the hospital with instructions to return to his normal work, that of a boilermaker, which is heavy physical labor.

The petitioner returned to Dr. Rosenblad. The exact dates and circumstances of the petitioner's next hospitalization at the Galveston General Hospital are not clear. In any event, while at the Galveston General Hospital and on or about 5 April he was seen by Dr. Lockhart with whom Dr. Pearson was associated and by Dr. Pearson.

Thereafter, on the suggestion of the petitioner's Texas attorney, Charles Britt of Alvin, Texas, the petitioner saw Dr. Minyard. The first consultation was on 24 April 1973. Dr. Minyard hospitalized the petitioner from 1 to 12 May and from 17 to 25 May. During this period of time there was an additional myelogram which was negative. Here, as with prior hospitalizations, the petitioner's pain reduced during extended bed rest and recurred upon leaving the bed. This was of significance to Dr. Minyard. Dr. Minyard rendered his report to Mr. Britt, the report bearing date of 2 July. We quote a portion of Dr. Minyard's report:

"This man has obvious clinical findings of a herniated lumbar disc at L4/5, therefore, I admitted him into the hospital and did a myelogram of the lumbar

and cervical regions which showed no protruded disc.

\* \* \* \* \* \*

"Although the myelogram in this case was negative initially, I feel that this man has an obvious clinical disc and, as such, will require exploration, removal of the disc, and in all medical probability, surgical fusion of his lumbosacral spine."

The petitioner, being in need of income, returned to Arizona going to Globe on about 1 September 1973. There, for approximately three weeks, he attempted to work. The pain was such that he returned to Dr. Minyard when, according to the petitioner's testimony, "I asked him to do something." Dr. Minyard operated on 3 October in the John Sealy Hospital.

In relation to the surgery we quote portions of Dr. Minyard's deposition testimony:

"A I prepared him for surgery. And on October the 3rd I did an L–4 - L–5 - S–1 laminectomy decompression, and I did an L–4 - 1–5 - S–1 lumbar fusion.

"Q All right. Now, Doctor, I want you to describe for us, if you will, what you found on surgery?

"A The thing that—in exposing him— of course, he had lipping of the lamina which isn't always common, but is one of the usual findings.

In other words, to remove—I had to remove two laminae to get down into the canal. I found that this man had a much narrower canal than I had anticipated. The space that he had for his dural sac, I think, was probably about half of what I would normally see for a man of his build or for the normal lumbar vertebrae.

We have a name for this condition. It's called spinal stenosis, and it must be considered a congenital condition.

"Q All right.

"A In other words, he had adequate room for his nerve roots, but there wasn't any spare room.

"Q All right.

"A So I took the lamina off of L–5, a good bit of L–4 and the sacral area; one thing, he had considerable enlargement of his preverterbral plexus; in other words, the veins about the dural sac anterior to the dural sac and posterior to the disc.

I explored the disc areas, and there was very little room. But I found no blockage. In other words, I didn't have enough space to pass this small catheter up and down, but I could take a small instrument called a crooked dural separator and feel my spaces. And I opened up the nerve root canals laterally.

They were filled. The nerve roots were, on the right side especially, quite swollen as is commonly seen where you've had a bulging disc, although the degree to me wasn't large enough to justify the removal of the disc. I didn't remove—

"Q Well, did he or did he not have a bulging disc on more than one?

"A Yes. There was two levels of L–4 and L–5 where I felt the discs were bulging. They were bulging more than would be normal but not enough to justify the removal of these discs.

"Q I see.

"A In other words, I elected not to remove them because I was going to do a bone graft. I did not want the bone graft wrapping around my nerve roots causing them to be further stenosed.

"Q All right.

"A And so I removed his apophyseal joints laterally and then took bone grafts from his right iliac region posteriorly and placed the bone grafts over the apophyseal joints and out towards the transferred processes.

\* \* \* \* \* \*

"Q All right. Now, Doctor, do you have an opinion based on reasonable medical probabilities as to whether or

not Mr. Perry had a—two bulging discs?

"A Did he have when I saw him?

"Q Yes.

"A Yes, he did. These discs are not normal discs.

"Q All right. Well, now, Doctor, do you have an opinion based on reasonable medical probabilities as to the producing cause of these bulges?

"A Sudden trauma to this area.

"Q Taking into consideration the history that you had and your examination and what you saw in surgery, do you have an opinion based on reasonable medical probabilities as to what sudden trauma if any, caused this condition?

"A Yes.

"Q What?

"A At the time he had this sudden fall and jerk back on February the 2nd in handling this—what, ten ton door or whatever the size of the door was."

Dr. Pearson's findings on his last examination differed in some respects from those of Dr. Minyard's examination conducted not long thereafter. Dr. Pearson did not materially disagree with the Dr. Minyard surgery based upon the conditions which Dr. Minyard observed during the surgical procedure.

Dr. McCluskey would not have operated. Had he found the low back situation which Dr. Minyard observed during surgery, Dr. McCluskey would have proceeded differently with the surgery.

Reviewing Dr. McCluskey's deposition testimony we find that at the time he released the petitioner from the hospital on or about 26 March 1973 he felt that the petitioner needed no further treatment and that the petitioner could return to his normal employment. He was "not able to come up with a specific cause" for the petitioner's low back pain. In relation to the gear shifting incident shortly before the hospitalization we find the following questions and answers:

"Well, were you treating him for a back injury that he got from shifting the gear in car, or were you treating him for a back injury that he got out in Arizona, Doctor?

"A I was treating him for what he was complaining of.

"Q I see.

"A I wasn't making judgments as to exactly where the injury occurred or when it occurred."

In relation to his examination of the petitioner Dr. McCluskey testified:

"Okay. I accepted what he told me; however, there were some things that were present in that initial physical examination that kept going on in subsequent examinations that just flat didn't fit.

People even with excruciating back pain can walk on their toes without feigning it. It doesn't change.

The business of refusing to allow a straight leg raising test or to even allow the bending of the knees prone on the table with hip extended does not fit.

"Q Are you saying—

"A These things just don't fit. This part of the evaluation of the patient.

All right. As I said in the report, he had some things that were suggestive of disc disease; however, the rest of the stuff made even that suspicious.

\* \* \* \* \* \*

"Q Well, Doctor, then, as I take it, when you saw him you thought he had some back problem and at least suspicioned some disc disease of some kind?

"A I felt it was a possibility, yes.

"Q All right, sir. And, of course, the surgeon that opened him up and looked at him would in the best position to testify as to that, would he not?

"A Yes."

■ The hearing officer in his findings and award laid great stress upon the gear shifting incident and found that as of Dr.

McCluskey's discharge of the petitioner from the hospital the petitioner's condition causally related to the accident was medically stationary without an industrial causally related disability. The evidence does not bear out that finding. An overall reading and view of the evidence compels the conclusion that the conditions Dr. Minyard found in the 3 October 1973 surgery bore a direct causal relation to the 2 February 1973 industrial incident. The hearing officer observed that Dr. Minyard was not informed as to the gear shifting incident. The record is silent as to whether he was or was not so informed, he was not asked the question.

If this was a civil case we would have no hesitancy in reversing with directions inasmuch as all parties had ample opportunity to present all available evidence. The statutes deprive us of this authority.

The award is set aside.

NELSON, P. J., concurs.

WREN, Judge (dissenting).

I do not feel the principle of *Broadu*s to be applicable here. In my opinion, the majority decision does more than merely review a medical conflict in a documentary record.

It is asserted in the opinion that petitioner's testimony does not preclude this court from acting as an appellate fact finder, because such testimony was without conflict, and there were no adverse comments relative thereto in the hearing officer's decision and award. The opinion further states that the oral testimony appeared to be "entirely credible."

Assuming *arguendo* that a conflict in medical testimony can ever be resolved by a reviewing court from depositions, when the patient has given a medical history of pain and events to the examining physicians, and has also testified to pain and events before the trier of fact, the record here belies the conclusion reached by the majority. I cannot agree that petitioner's testimony basically comprised only a recita-

tion of post-injury events, and that the key evidence was contained wholly within the depositions.

For instance, counsel for petitioner, in urging the reliability of the deposition of Dr. Minyard before the hearing officer, stated in his summation:

"Now we have two things, one appearing in the deposition and *one appearing from Mr. Perry's testimony* after or during and after that surgery . . . . Mr. Perry is now post-operative four months and I think the hearing officer, *who has observed him walking around the hearing room, can see he is doing well postoperatively . . . ."* (Emphasis supplied).

Also to be noted is the fact that the hearing officer treated the gear shifting incident as raising a question of causal relationship of the injury to an industrial episode. In finding No. 6 he noted:

". . . . Dr. McCluskey stated the applicant said he had twisted his back shifting gears the day before his hospital admission with great resulting pain increase, and the hospital admission record states applicant 'apparently injured back placing car in gear'; and Dr. McCluskey concluded by stating he released the applicant as of March 27, 1973 to full work with no February 2, 1973 injury residual."

This finding is clearly supported by the following excerpt from the deposition of Dr. McCluskey:

"A. Excuse me. I am sorry. On my note I have, 'Immediately prior to admission he noted that he was having difficulty shifting his car and apparently injured his back while apparently getting the car back into gear.'

"Q. Was he getting along satisfactorily prior to that time?

"A. According to him, yes, sir, he was.

"Q. And after he wrenched his back, he was having difficulties?

"A. Yes, sir.

"Q. Can a wrenching of the back when it was in a weakened condition like this, be the approximate cause of a bulging disc to the right of L–4, L–5?

"A. Let me answer that by saying that a 'bulging disc' or a 'disc injury' may result from such an injury or such an accident or incident as the case may be.

I would not say that the back was 'weakened' prior to that time."

Petitioner, however, in response to questions by Mr. Moeller, testified before the hearing officer as follows:

"Q. As I read Dr. McCluskey's reports and his testimony at the time we deposed him, he said you were getting along fine until you tried to shift the gears on your car.

"A. No, he made a big thing out of that. I just happened to mention it to him. He asked me what was wrong and I told him.

"Q. So if it was his feeling you were getting along fine prior to the time you shifted those gears and had the new pain that you had when you were admitted to the hospital, that was incorrect?

"A. Yes, I think so. Yes."

It is the opinion of this writer that this statement created a sharp conflict before the hearing officer as to possible causal relationship of the gear shifting incident, and in resolving it, the hearing officer had to consider the credibility of the petitioner testifying orally in his presence.

I cannot find such evidence to admit *only* the conclusion reached by the majority court, and this the evidence must do to overturn the award. We must view the evidence in a light most favorable to upholding the award of the Industrial Commission, and resolve all conflicts in the testimony in favor of supporting the award. *Micucci v. The Industrial Commission of Arizona,* 108 Ariz. 194, 494 P.2d 1324 (1972); *Malinski v. The Industrial Commission of Arizona,* 103 Ariz. 213, 439 P.2d 485 (1968).

An award reasonably supported by the evidence cannot be disturbed by this court. In re Estate of Bedwell, 104 Ariz. 443, 454 P.2d 985 (1969).

I would affirm.